# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-21-00085-CV

---

S. G. and S. T., Appellants

v.

Texas Department of Family and Protective Services, Appellee

---

FROM THE 146TH DISTRICT COURT OF BELL COUNTY
NO. 302,469-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

# M E M O R A N D U M   O P I N I O N

Appellants S.G. (Mother) and S.T. (Father) appeal from the district court's decree terminating their parental rights to their children, son D.T. (Child 2), born December 5, 2016, and daughter S.M.T. (Child 3), born May 18, 2018.[1] In a single issue on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the district court's finding that termination of her parental rights is in the best interest of the children. In four issues on appeal, Father also challenges the legal and factual sufficiency of the evidence supporting the best-interest finding and additionally challenges the legal and factual sufficiency of the evidence

---

[1] For the children's privacy and to avoid confusion, we refer to them by their initials and their birth order. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. A third child involved in the suit was daughter L.G. (Child 1), born September 11, 2014, the daughter of Mother and another man. However, in July 2019, Child 1 was placed with her father, and in February 2020, the suit involving Child 1 was severed from this suit.

regarding the statutory grounds for termination. For the following reasons, we will reverse the termination decree and remand for a new trial.

## BACKGROUND

In August 2018, the Texas Department of Family and Protective Services (the Department) filed suit to terminate the parental rights of Mother and Father to Child 2 and Child 3, following allegations of physical abuse and neglectful supervision by Mother against Child 3. In the removal affidavit, Department investigator Tracey Scott averred that Child 3 suffered a "significant amount of severe injuries which were caused while [Child 3] was in [Mother]'s care," and that "[m]edical professionals believe all of the injuries are not consistent with the explanation given by [Mother]." Scott further averred that during the investigation into the injuries, Father refused to cooperate with the Department.

While this suit was pending, Mother and Father had another daughter, S.T. (Child 4), born October 18, 2019, and the Department initiated a separate suit affecting the parent-child relationship involving this child.[2] As we discuss in detail below, the circumstances involving the parents changed significantly after the birth of Child 4.

The suit involving Child 2 and Child 3 proceeded to a bench trial that began on January 3, 2020, and was continued on August 28, 2020, September 4, 2020, October 27, 2020, and December 16, 2020. We discuss the evidence presented during trial in detail below. At the conclusion of trial, the district court took the matter under advisement and later found that

---

[2] When asked why Child 4 was not in the same case as Child 2 and Child 3, Department caseworker Vanessa Taylor, who was assigned to the case involving Child 2 and Child 3, testified, "So supervisors and everybody just thought it was in the best interest of the case for [Child 4] to have her own case due to the animosity between myself and the parents." The Department caseworker assigned to the case involving Child 4 was Loni Hernandez, who testified at trial as a witness for Mother.

termination of Mother's and Father's parental rights was in the best interest of the children and that Mother and Father had: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). This appeal followed.

**STANDARD OF REVIEW**

The district court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State

initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

4

**DISCUSSION**

**Best-interest finding**

In Mother's sole issue and Father's fourth issue, they argue that the evidence is legally and factually insufficient to support the district court's finding that termination of their parental rights is in the best interest of the children. When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the children's wishes, the children's emotional and physical needs now and in the future, emotional or physical danger to the children now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the children by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id*. (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent

5

should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

### Mother's and Father's conduct and danger to the children now and in the future

The Department presented evidence that Child 3 suffered serious injuries on one occasion. At the time the case began, Child 3, who was then three months old, was in the hospital for injuries that included fractures to her skull, arm, and foot, and bruising to her face, scalp, neck, and upper right arm. According to Department investigator Tracey Scott, Mother told her that Child 3 had been injured when she fell off a bed. However, according to the child's medical records, Child 3 had "injuries to both sides of her body and on multiple body surfaces that do not appear consistent with a single fall from the bed as reported." The records further stated that Child 1 "told the CPS worker that [Mother] threw [Child 3] to [Child 1] to catch but that she was unable to and the baby fell on the floor." The doctor who evaluated Child 3 wrote in her evaluation that she believed Child 3 "has been the victim of physical abuse and her safety would be at risk if returned to her previous social situation."

Mother testified that on August 21, 2018, the day before Child 3 was taken to the hospital, Child 3 had been in the care of Mother's friend, Latoya Shepard. When Shepard returned Child 3 to Mother that night, Mother noticed that Child 3's arm appeared "swollen," but she "didn't think nothing of it" at the time. Mother placed an ice pack on the arm and wrapped it in a bandage. Mother testified that she was not concerned about the swelling until "the Vaseline came off of" the child. When asked why she did not take Child 3 to the hospital that night,

6

Mother explained, "Because, like I said, the Vaseline—if the Vaseline wouldn't have been on there, I probably would have been able to see it. But the Vaseline didn't wear off until the next day. So that's when everything really appeared up on her, when the Vaseline weared off." At that point, Mother sent her mother a photo of Child 3's arm, and her mother told her, "You need to take her to the emergency room." Mother did so.

When asked if Child 3 had any accidents or falls the morning that she was taken to the hospital, Mother testified that Child 3 had "just rolled off the bed" in Mother's bedroom. Mother added that she had been in the bathroom changing another child's diaper at the time and had left Child 3 unattended for "[l]ike maybe five or ten minutes at the most," when she heard Child 3 fall onto the floor. Mother testified, "As soon as I heard my baby fall, I literally took out of the bathroom and went straight to my baby" and "picked her up off of the floor." Mother denied hurting Child 3, dropping her, or throwing her to the ground.

Father testified that on the night of August 21, he noticed that Child 3's arm was swollen and was told by Mother that Child 3 was "crying and stuff like that, but that's the only thing [he saw] that was wrong with her." Father assumed that Mother had already taken Child 3 to the hospital because Child 3's arm was wrapped in a bandage. The next morning, he left the house early and was not informed until later that day that Child 3 had been taken to the hospital. When asked if he had checked on Child 3 before leaving the house that morning, Father testified, "She was good to me. She was good. I didn't see no bruising." Father denied causing Child 3's injuries and testified that he did not believe that Mother caused Child 3's injuries, although he acknowledged that Mother was alone with Child 3 during some of the time on August 21 and 22, the dates on which the injuries most likely occurred. Both Mother and Father claimed that Child 3 might have been injured while in Shepard's care.

7

The Department also presented evidence that Mother and Father had in the past used cocaine and synthetic marijuana, also known as K2 or "spice." When asked how often she and Father had used synthetic marijuana, Mother testified, "Like often," although she denied that they used it "every day." When asked if they used it "every other day," Mother answered, "I wouldn't say 'every other day.' I mean, we give it time. We just don't smoke it like we're addicted to it. It's not something that I have to have every day." Mother also acknowledged that she tested positive for cocaine when the case began, although she claimed that she "only did cocaine because [she] was at a party."

Father similarly admitted that he had been using cocaine and synthetic marijuana at the time the children were removed in August 2018, although he claimed not to have known that Mother was using cocaine until after she had tested positive. Father denied using drugs inside the house and claimed that he had used drugs only when he would "walk outside." Father also claimed that he had stopped using drugs three months after the case began, in November 2018. However, Department caseworker Vanessa Taylor, who had been assigned to the case involving Child 2 and Child 3, testified that Mother and Father continued testing positive for illegal drugs "several times" after the case had begun, and drug-test results admitted into evidence confirmed this. Almost all the positive drug tests were for synthetic marijuana. Father tested positive for cocaine one time in September 2018, over two years before the final trial setting in December 2020, and Mother tested positive for cocaine twice, once in September 2018 and again in September 2019, over one year before the final trial setting. Taylor testified that the last time Mother and Father tested positive for synthetic marijuana was November 9, 2019, and she acknowledged at the August 2020 trial setting that throughout 2020, both parents had consistently and weekly tested negative for illegal drugs.

8

*Stability and parental abilities of Mother and Father*

At the time Mother testified, at the September 2020 trial setting, she was living in a motel due to renovations taking place at her apartment complex and had been unemployed for three months but was looking for a job. Mother testified that she had previously worked at AGE Industries, a manufacturing company in Belton. When asked why she was no longer working at that job, Mother testified, "Because I didn't have transportation." She added that she "currently [has] transportation right now," specifically a membership with Lyft, a ridesharing company. Mother also testified that she was "currently getting unemployment" benefits of $1200 per month and that she was paying child support for her oldest daughter, Child 1, of $100 per month. Mother further testified that she is currently attending therapy with Tawanna Flowers. Mother testified that she had "just started" therapy with Flowers, and she claimed that she had been unsuccessful with previous therapists who had been assigned to her in the case because she had been pregnant, did not have reliable transportation, and was looking for a job.

Mother testified that she was approximately "22 or 23 weeks" pregnant with another child (Child 5) and that Father could be the father of Child 5. When asked to specify her current relationship with Father, Mother testified, "We're not together." Father also testified that he was no longer in a relationship with Mother, but he acknowledged that he could be the Father of Child 5.

At the time Father testified, at the August and September 2020 trial settings, he lived in a three-bedroom apartment and had been unemployed for two weeks, since he had resigned from a job that he had held for two months. Father testified that this job had paid him $3,000 per month and that he currently had "around $7000" in savings to pay rent and other expenses while he was unemployed. Father explained that he was looking for work with the

9

assistance of a temp agency but was waiting on the results of the termination trial to determine the number of hours that he would be able to work if the children were returned to him. Father also testified that he was working on getting his driver's license. Father stated that he was prepared to pay for childcare once he found a job and that he would leave the children only in the care of someone he trusts.

Father further testified that he had seven children, including the children that were the subject of this suit, but that he did not have full custody or pay child support for them. Latasha Oliver, the mother of two of Father's other children, testified on the final day of trial in December 2020. Oliver testified that Father supported her and their children financially, even though he had not been ordered by a court to do so, and that her children had lived with Father "for about three months now." When asked for her opinion on Father's parenting abilities, Oliver testified, "I think he [is] an awesome dad. He's trying. He ain't did like the rest of the dads I know and gave up and not trying to help with his kids. He helps with his kids, all of them, even the ones that's not his." She added that Father has "always been a protective parent over his children. He's protective over children, period." When asked in what ways Father was protective, Oliver testified, "As far as keeping them safe, feeding them, clothing them, making sure they bathe, making sure that they're not getting into nothing that they're not supposed to be getting into." When asked to describe her impression of Father "now as opposed to two years ago," Oliver testified, "He [has] changed. He [has]—I mean, everybody makes mistakes. He [has] changed. He's trying. He's trying to take care of his kids. Like I say, we all make mistakes."

Another witness for Father was his aunt, Natia Ned, who testified that Father would often babysit her younger two children, ages eight and eleven, "like every other weekend

10

or every two weeks." When asked if she had ever known Father to be violent with children, Ned testified, "No, and I've been knowing him all my life, all his life." She also testified that she was "very" confident in Father's ability to be a protective parent for the children.

Father's current therapist Sam Callaway testified at the September 2020 trial setting. At that time, Callaway had seen Father ten times beginning in June 2020. When asked what they had been working on in therapy, Callaway testified, "We've had several different things. We've done a lot on protective parenthood. We've done a lot about alcohol, drug abuse, and the dangers of it, making right decisions." When asked what concerns, if any, he had with Father having custody of his children, Callaway testified, "Initially, the injuries to the child were very upsetting. I wanted to evaluate the kind of person he was to see if I felt like he could do that kind of thing, and since then I've found him to be a pretty mild person." He also testified that Father told him that "he didn't have anything to do with [Child 3's] injuries" and that "I think maybe he believes this other lady that had the possession of the child may have been responsible." Callaway believed that Father had made progress in the ten sessions that he had seen him, although he acknowledged that he had seen Father only during the time that Father was not taking drugs. Callaway explained,

> He comes in at the beginning and speaks and he responds to the teaching on protective parenting. Again, I appreciate . . . that I didn't know him when he was using drugs, so all I've got to judge by is what I have right now. But he's very attentive and he's very engaged in every moment that he's in my office.

Callaway added that he had no difficulties regarding Father failing to show up, canceling, or failing to arrive on time for appointments. In fact, Callaway testified, "he's there early."

Callaway further testified that he did not think Father "was ready necessarily for the children to return to his home. I think he needs to have—spend some time with the kids, a

11

little more time with the kids, and have further evaluation." He added, however, that he did not believe that Father was a "danger" to the children "from what I know of him right now" and that with continued therapy, Father "would become a good parent and can become a good parent. He only speaks well of the children, he only speaks lovingly of the children, and so I believe he can put that into practice."

Loni Hernandez, the Department caseworker who had been assigned to the separate case involving Child 4, testified at the September and October 2020 trial settings. At the September setting, she agreed that she had been the caseworker "facilitating [Mother's and Father's] services pretty much for the last several months" and had "sort of taken over the mantle of controlling their services" because "this case is now in final hearing." Hernandez testified that the primary permanency goal in the case involving Child 4 is family reunification. When asked why she had not changed the goal to something other than family reunification, Hernandez explained, "When I look at the services and the changes that the parents have made through the start of my case in November 2019, they've come a long way. They continually make changes in regards to [Child 4]." One of those changes, according to Hernandez, was that they were living separately, which Hernandez believed had been beneficial to their progress in completing services. When asked if she felt like both parents were making a sincere effort to work their services, Hernandez testified, "Absolutely. In regards to [Child 4], they've made massive changes." When asked to describe these changes, Hernandez testified:

> [Father] is no longer homeless; he has a home. He has completed the—paying his fine so that he could take the course to get his driver's license. He has an appointment to complete his driver's license next week. I believe it's the 9th [of September]. He is attending therapy. He is drug testing negatively.

Mom is attending therapy. She was working. She has stated to me that she's applying and in the process of getting hired at the VA, and she had to take a drug test. And then she has a home. It is in the process of being renovated, but the entire [apartment complex] is in the process of being renovated. And then she has a vehicle, and from my understanding she's supposed to be working on her license. She hasn't provided me proof of completing that. Oh, and she's drug testing negative.

When asked if she was "concerned about the prior injuries to [Child 3] and the lack of explanations for those injuries," Hernandez testified,

Absolutely, we are. Unfortunately, we don't know who committed the injuries to [Child 3], and so we're trying to look at what the parents have done, what behaviors they've changed. And we definitely would love to know who injured this child, and that's why we have it being addressed in therapy.

When asked what the parents could address in therapy "if they're both denying that either one of them caused the injuries," Hernandez testified, "That's a good question. Both of them have told me that they are adamant that someone else did it. [Father] has swore up and down that he was not present when the injuries happened at all."

Hernandez further testified that Mother had an I.Q. of 56, which she acknowledged was a "pretty low score," but she believed that Mother "could get to a point where she could parent [Child 4]. Absolutely." When asked if she felt that Mother's "I.Q. level impedes her ability to work services or to parent her children," Hernandez testified,

I would not say that. The reason that I say that is because she does show up to her visits with [Child 4]. She follows when I tell her she's got to do certain things, like making sure that [Child 4] has hand sanitizer at the beginning of her visit. She remembers it from week to week. She remembers to bring toys and things like that for [Child 4].

Hernandez also testified that "there were no safety concerns" with Mother's home.

13

Regarding Father's living situation, Hernandez clarified that when she had earlier testified that Father used to be "homeless," she meant that he was "bouncing from home to home. He was staying with [Mother] some days, he was staying with [a relative]. He didn't have a home where his name was on the lease and he was responsible for the bills." Now, however, Father had a home, and Hernandez testified that "there were no safety concerns" there. When asked if she had concerns about Father's "ability to provide for [the] welfare and safety of his children," Hernandez testified,

> Yes and no. It was kind of shocking that he quit a job that was—I mean, he was making decent money. He was able to pay all of his bills, and so just quitting it without having something lined up can cause some apprehensions. He's trying to do the other things. He has not provided me any family or friends as backup support.

Hernandez also testified that Father had provided her documentation confirming that he had been employed in July and August 2020 and earlier in February, March, and April 2020.

Hernandez testified that Mother and Father had been consistent in attending all their visits with the children. Department caseworker Taylor similarly testified that Mother and Father "don't miss a visit. They're always at the visits." Taylor also testified that Mother and Father bring to the visits "toys, food, clothing, you know, they always come with lots of stuff for the children." She added that the children seemed excited to see Mother and Father during the visits and that, other than some "rowdy" behavior by the children during the visits that the parents failed to "redirect," she had "no concerns with the visits."

Hernandez further recounted that during the visits, Father would provide items that Child 4 needed, such as a new car seat, that he was "a safe and nurturing father when he's engaging with [Child 4]," and that he had followed Hernandez's recommendations "with respect

14

to what he can do to provide a safe environment for his child." Hernandez testified that Father was making progress in completing his services. When asked how she could see her "recommendation changing for a monitored return" of that child "if the visits continue going well and the drug testing continues going well," Hernandez explained,

> [M]ost likely I'll be asking for an extension so that we can provide a little bit more time to [Father]. It seems like for sobriety he's been doing that since December [2019]. But in regards to therapy, it was only started with this therapist in June [2020], so we probably need a little bit more time.

During the next trial setting in October 2020, Hernandez testified that she had in fact requested an extension in the case involving Child 4. When asked why she had done so, Hernandez explained, "Due to COVID and the parents not having the opportunity to completely work all their services, such as in-person visits, in-person therapy, things like that, as well as this case." Hernandez added that she had received a recommendation from Father's therapist that Father be allowed unsupervised visits with Child 4 and that the Department was not opposed to that recommendation. At the time of the December 2020 trial setting, unsupervised visits had begun.

Hernandez further testified that Mother was attending therapy every week, although Hernandez did not have any notes or recommendations from Mother's therapist. When asked if Mother has "continued in her other services" since the last trial setting in September, Hernandez testified, "Yes. She still has a home. She is drug testing negatively." Hernandez added that the renovations at Mother's apartment complex "have been completed" and that Mother had returned to her apartment.

When asked if, "in regards to their current services, [Mother and Father] are doing them and they are doing them satisfactorily," Hernandez testified, "In regards to the other case

15

[involving Child 4], yes, sir. That is correct." She added that she was still recommending family reunification in the case involving Child 4, although she was not making that recommendation in this case.

It was Taylor, the Department caseworker who acknowledged that there was "animosity between [her]self and the parents," who recommended terminating Mother's and Father's parental rights. Taylor testified primarily at the January and August 2020 trial settings, although she also testified briefly at the later settings. At the January and August 2020 settings, Taylor testified as to the court-ordered services that Mother and Father had failed to complete, including their unsuccessful discharge from multiple therapists, their failure to test negative for illegal drugs earlier in the case, and their failure to pay child support.

Taylor further testified that she "had concerns for [Father's] aggressive behavior and his fights." She explained that following a court appearance in the case, Father and other relatives of the children had a "scuffle" with Child 1's father near the courthouse elevator and that they all had to be escorted out of the courthouse and to their cars by the court bailiff. Taylor also testified about an incident between her and Father during one of her home visits in which Father became argumentative with Taylor, accused her of failing to help him "get his children back," and "kind of bristled up aggressively as if he wanted to hit [her]." Taylor testified that she "reared back and made him aware that [she] wasn't afraid of him," but Father kept saying that she was "provoking him and [that] he [was] going to do something" about it.

Father denied that any such incident with Taylor occurred. Additionally, Department caseworker Hernandez testified that she had no experiences with either Mother or Father in which they were aggressive toward her, that they had been cooperative with her, and

16

that at no point did she feel threatened by either of them. Father's therapist Callaway similarly testified that Father was cooperative and not aggressive during their therapy sessions.

At the August 2020 trial setting, Taylor was asked why she was still "asking for termination" if Mother and Father had been testing negative for illegal drug use "the last eight months."[3] Taylor testified, "I don't have a recommendation from any therapist saying that—we still have a child that was severely injured with no explanation." When asked if the Department knew who caused the injuries to Child 3, considering that "it's been two years since these injuries" occurred, Taylor testified, "No ma'am."

At the December 2020 trial setting, Taylor maintained that terminating Mother's and Father's parental rights was in the best interest of the children, despite Mother and Father testing negative for illegal drugs for over one year. When asked if the parents had made "significant life changes" in that time, Taylor testified, "I'm not sure," although she acknowledged that "they're no longer testing positive for illegal substances." She added that her recommendation for termination was based solely on "what happened in [her] case."

### Department's plans for the children

At the January 2020 trial setting, Taylor testified that the Department's plan for the children was adoption, that the children had been placed in a foster home at the time of removal in August 2018, and that the foster placement had wanted to adopt Child 2 and Child 3. However, when Child 4 was born, that child was placed in the same foster home, and the foster placement later changed her mind and no longer wanted to adopt the children because three

---

[3] Taylor acknowledged later in her testimony that at the time of the August trial setting, Mother and Father had been testing negative for closer to ten months.

17

siblings were "a bit much for her," although she agreed to let the children remain at her home until a new placement could be found.

At the August 2020 trial setting, Taylor testified that the children had not yet found an adoptive home. Taylor explained, "We did look and found a placement" in Houston, but "COVID happened, so we had to stop the children's visit with that placement." She added that the placement had been interested in adopting the children but that "they changed their mind because they couldn't see" or have any interaction with the children due to COVID. Taylor also testified that home studies with two relative placements, specifically Mother's mother and Father's grandmother, had been denied. At the conclusion of the August trial setting, the district court directed the Department "to investigate and find possible legal-risk placements for the children." At the September 2020 trial setting, Taylor informed the district court that she had scheduled a pre-placement visit with a possible home.

At the October 27, 2020, trial setting, Taylor testified that Child 2 and Child 3 had been placed in a new foster home "[a]bout two and a half weeks ago." At the December 2020 trial setting, Taylor testified that Child 2 and Child 3 remained in the home where they had been placed in October, and she agreed that the current placement was "an appropriate placement that could possibly lead to the adoption of these two children." The children's guardian ad litem recommended termination of Mother's and Father's parental rights and that the children remain in their current placement. She testified that they were "doing extremely well with their current foster care placement." She also testified that "[t]hey're growing, they're thriving, they're being introduced to different activities within the community." She added, "And I know there has been some concerns with [Child 3's] speech therapy. She's receiving all of the medical care at this

18

time." No other testimony was elicited as to the characteristics or appropriateness of the current placement.

### *Desires of the children*

At the September 2020 setting, caseworker Hernandez testified that Mother and Father had visited Child 2, Child 3, and Child 4 together because the children had resided in the same foster home. When asked if Child 2 and Child 3 had "a bond and a relationship" with Child 4, Hernandez testified, "Absolutely." Hernandez also testified that she believed that it was in the three children's best interest to remain together.

Caseworker Taylor testified differently. At the December 2020 setting, when asked if she thought that, before terminating Mother's and Father's parental rights, it would be "worthwhile" to wait and see if all the siblings "could be reunified together in one home," Taylor testified, "No, sir, I don't agree." However, when asked if there was "any risk" that the current foster home would "give up placement" "if the decision on this termination was made months from now to see what the outcome of that other case is," Taylor testified, "No, sir."

### *Conclusion regarding legal sufficiency*

In sum, the Department presented evidence that Mother and Father had used illegal drugs while the children were in their care and after the case had begun; that Child 3 had suffered serious injuries while in the care of Mother or someone with whom Mother had left the child and that Mother's explanation for those injuries was not consistent with the medical evidence; that Father was unaware of the severity of Child 3's injuries and disregarded the possibility that Mother could have been responsible for those injuries; that Father acted "aggressively" toward one of the Department's caseworkers and got into an altercation with the

19

father of Child 1 at the courthouse; that both Mother and Father failed to comply with their court-ordered family service plans; and that both Mother and Father had unstable employment and housing situations when the case began. Also, the Department presented evidence that the children were doing "extremely well" in their current placement. Viewing this evidence in the light most favorable to the district court's finding, we conclude that it is legally sufficient to support the district court's finding that termination of Mother's and Father's parental rights was in the best interest of the children.

### *Conclusion regarding factual sufficiency*

We cannot reach the same conclusion regarding factual sufficiency. Department caseworker Taylor testified that her recommendation for termination of parental rights was based only on "what happened in [her] case." We cannot do the same. Our factual-sufficiency review must consider the evidence "in light of the entire record" before us. *See A.C.*, 560 S.W.3d at 631. That record includes the testimony of Department caseworker Hernandez, who, by the time of the September 2020 hearing, had been "facilitating [Mother's and Father's] services pretty much for the last several months" and had "sort of taken over the mantle of controlling their services." Hernandez testified that the primary permanency goal in the case involving Child 4 was family reunification, not parental termination, and this was despite the serious injuries to Child 3. Hernandez acknowledged that the Department was "absolutely" concerned about those injuries but testified that "we don't know who committed the injuries to [Child 3]." Thus, Hernandez's recommendation for family reunification was based on the "massive changes" that she had seen the parents undergo after Child 4 had been born. These changes included that both parents were testing negative for illegal drugs on a consistent basis throughout 2020, attending

20

therapy, and living in homes in which there were "no safety concerns." Taylor's recommendation for parental termination, in contrast, was based primarily on what had occurred before January 2020.

Although we consider the evidence of Mother's and Father's past behavior in the best-interest determination, particularly the serious injuries to Child 3, in a factual-sufficiency review, we must consider the disputed evidence contrary to the finding. Regarding the injuries to Child 3 prior to her removal, it remained unknown at the time of trial how the child was injured and both parents denied that they had caused the injuries. On this record, we cannot conclude that those unexplained injuries provide factually sufficient, "clear and convincing evidence" that termination of Mother's and Father's parental rights is in the best interest of the children. Similarly, because there is undisputed evidence that at the time their rights were terminated, Mother and Father were attending therapy on a regular basis, had made "massive changes" for the better, and had been testing negative for illegal drugs for over one year, we cannot conclude that Mother's and Father's past failures in those areas provide factually sufficient, "clear and convincing evidence" that termination of Mother's and Father's parental rights is in the best interest of the children. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). ("[T]he mere fact that an act or omission occurred in the past does not ipso facto prove that termination is currently in the child's best interest."); *see also In re R.L.*, No. 04-13-00226-CV, 2013 WL 5508381, at *6 (Tex. App.—San Antonio Oct. 2, 2013, no pet.) (mem. op.) (explaining that "[t]he best-interest inquiry is a forward-looking determination").

Father, in particular, had been attending therapy since June 2020, and his therapist testified that he did not believe Father presented a danger to the children "from what I know of him right now" and that with continued therapy, Father "would become a good parent and can

21

become a good parent." Father also presented his own witnesses who testified to his ability to be a protective and loving parent, and Taylor's claim of Father's aggressive behavior was disputed by other witnesses.

Moreover, both Hernandez and Taylor testified that Mother and Father attended all their scheduled visitations with the children and that the visits went well, and Taylor testified that the children seemed excited to see Mother and Father during the visits. Thus, this was not a case in which the visits revealed that the children did not want to see their parents, that the parents behaved inappropriately around the children, or that the parents were delinquent in visiting their children.

Additionally, there was undisputed evidence that Child 2 and Child 3 had "a bond and a relationship" with Child 4, and Hernandez believed that it was in the three children's best interest to remain together. However, terminating Mother's and Father's parental rights to Child 2 and Child 3, while at the same time moving toward reunification with Child 4, would separate the siblings, which would not be in their best interest. *See In re De La Pena*, 999 S.W.2d 521, 535 (Tex. App.—El Paso 1999, no pet.) ("Where it is possible for siblings to be kept together and reared as a family, it is not in the best interest of the children that they be separated.").

In light of the entire record, we conclude that the disputed evidence regarding the best interest of the children is so significant that the factfinder could not have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the best interest of the children. Accordingly, the evidence is factually insufficient to support termination of their parental rights.

We sustain Mother's sole issue and Father's fourth issue.

22

**Statutory grounds for termination**

We must also address Father's first, second, and third issues to the extent that he argues the evidence is legally insufficient to support the district court's findings as to the statutory grounds for termination, because legal insufficiency would entitle Father to rendition of judgment in his favor. *See, e.g.*, *C.L.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-13-00646-CV, 2014 WL 1203239, at *7 (Tex. App.—Austin Mar. 20, 2014, pet. denied) (mem. op.). We will focus our analysis on the district court's endangerment findings, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), because of their "significant" collateral consequences, *see In re N.G.*, 577 S.W.3d at 237 (explaining that "as a matter of due process and due course of law," appellate court must review sufficiency of evidence supporting (D) or (E) grounds "when the parent has presented the issue to the court" because endangerment findings in prior termination proceedings can be used as basis for termination in subsequent proceedings involving other children).

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id*. § 161.001(b)(1)(E). These grounds are intertwined; subsection (D) focuses on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while subsection (E) focuses on the parent's conduct and whether the

23

parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied). Both subsections require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. "Endangerment does not need to be established as an independent proposition but may be inferred from the parental misconduct." *A.C.*, 577 S.W.3d at 699; *see C.V.L.*, 591 S.W.3d at 750.

"Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)." *C.V.L.*, 591 S.W.3d at 751. However, "a finding of endangerment based on drug use alone is not automatic." *Id.* (citing *In re D.C.*, 128 S.W.3d 707, 715–16 (Tex. App.—Fort Worth 2004, no pet.)). "The party seeking termination must still present clear and convincing evidence of the child's actual physical surroundings or conditions that were created by the endangering conduct to satisfy the requirements of subsection (D) and must show a continuing course of conduct to satisfy the requirements of subsection (E)." *Id.*

24

In this case, the Department presented evidence that Child 3 suffered serious injuries on or about August 21 or 22, 2018. Father admitted that during that time and while the children were in his care, he used illegal drugs, specifically cocaine and synthetic marijuana. Mother made similar admissions. Although Mother denied that she and Father had used drugs the night before or the morning she took Child 3 to the hospital, the district court was free to disbelieve her denial and infer that Mother and Father had been using drugs on the date that Child 3 was injured. The district court could have further inferred that as a result of Father's drug use, he had failed to recognize or respond appropriately to the severity of Child 3's injuries. Father testified that on the night of August 21, shortly after Mother's friend had returned Child 3 to them, he noticed that Child 3's "arm was swollen" but "that's the only thing [he saw] that was wrong with her." When asked why he did not take Child 3 to the hospital that night, Father testified that he "assumed," without asking, that Mother had already taken the child to the hospital. Father also testified that the next morning, when he checked on Child 3 before leaving the house, she looked "good to [Father]. She was good. [He] didn't see no bruising." But Child 3 was not "good," and had extensive bruising. When Mother took Child 3 to the hospital later that morning, Child 3 was diagnosed with injuries that included fractures to her skull, arm, and foot, and bruising to her face, scalp, neck, and upper right arm. Father testified that he suspected that Mother's friend rather than Mother caused the child's injuries, although he acknowledged that Mother was alone with Daughter during some of the time on August 21 and 22, the dates on which the injuries most likely occurred. The district court could have reasonably inferred from this evidence that Father endangered Child 3's well-being by failing to recognize, as a result of his illegal drug use, the severity of her injuries and, instead of taking her to the hospital, did nothing and left her with Mother, who might have been responsible for those injuries. Moreover,

25

Father's continuing to test positive for illegal drugs during the first year of the case supported a finding by the district court that Father's illegal drug use had been an ongoing habit that created an endangering environment for the children even before Child 3 had been injured. On this record, we conclude that the evidence is legally sufficient to support the district court's endangerment findings under subsections (D) and (E). *See id.*

We overrule Father's first and second issues to the extent they challenge the legal sufficiency of the evidence supporting the district court's endangerment findings. Because we are already remanding the case to the district court for a new trial, we need not consider Father's first and second issues to the extent they challenge the factual sufficiency of the evidence supporting those findings. *See In re M.A.J.*, 612 S.W.3d 398, 408–09 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *Horvatich v. Texas Dep't of Protective and Regulatory Servs.*, 78 S.W.3d 594, 604 n.6 (Tex. App.—Austin 2002, no pet.). We also need not consider Father's third issue, in which he challenges the sufficiency of the evidence supporting the district court's finding under subsection (O). *See A.C.*, 577 S.W.3d at 698.

## CONCLUSION

We reverse the district court's termination decree and remand the case to the district court for a new trial. *See Horvatich*, 78 S.W.3d at 604.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Kelly

Reversed and Remanded

Filed: August 6, 2021